**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 1:19-cr-00374 (RDM)** |
| **AHMAD "ANDY" KHAWAJA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT KHAWAJA'S MOTION TO
DESIGNATE MATERIAL WITNESS, FOR A RULE 15 DEPOSITION,
AND FOR DISCOVERY**

For more than four years, the defendant, Ahmad Khawaja, has refused to submit to this Court's jurisdiction and has remained a fugitive from justice. By his counsel's own admission, "[t]here is currently no date set for Mr. Khawaja's return to the United States." Affidavit of Kenneth Julian, ECF No. 249. Yet he now audaciously asks this Court to provide him with benefits—an order to designate his co-defendant, George Nader, as a material witness for trial, an opportunity to depose Nader or detain him indefinitely until the defendant decides to return to the United States, and an order requiring the government to prematurely produce criminal discovery— without subjecting himself to the Court's authority to enforce any of its rulings. *See* ECF No. 250. The Court should deny the defendant's motion for three reasons: (1) the fugitive disentitlement doctrine divests the defendant of his right to seek relief from the Court while simultaneously refusing to subject himself to the Court's jurisdiction, (2) the defendant has failed to present "exceptional circumstances" that warrant ordering a deposition, "in the interests of justice," under Federal Rule of Criminal Procedure 15, and (3) the defendant's claim that Nader is a material witness for a trial in this matter is unripe for judicial consideration because the defendant has not been arraigned nor has he entered a "not guilty" plea; thus, it remains unknown whether a trial will

1

actually occur.  The Court should deny the defendant's motion.

## I.      FACTUAL BACKGROUND

The defendant engaged in a complex scheme to funnel more than $4 million in illegal campaign contributions into the 2016 election for President of the United States. *See generally* Indictment, ECF No. 1.  As evidenced by the explicit electronic communications between the defendant and Nader detailed in the Indictment, the defendant believed the contributions to be funded by a foreign government seeking to influence a U.S. election.  Specifically, the defendant is accused of conspiring with Nader, a purported advisor to Middle Eastern governments, to funnel more than $3.5 million originating from Nader and/or a foreign government into political committees supporting one of the candidates for President in 2016.  In doing so, the defendant and Nader sought to gain access to, and influence with, the Presidential candidate and other high-level U.S. government officials.  Furthermore, to conceal his illegal activity, the defendant fabricated a licensing agreement between his U.S.-based company, and Nader's foreign company to make it appear that the two were engaged in a legitimate commercial transaction, rather than the laundering of funds for illegal political contributions.  And, when the defendant could no longer contribute money in his own name due to campaign contribution limits, he used his network of friends and business associates, including his co-defendants, to funnel the illicit money into the campaign in their names.

Following the 2016 Presidential election, the defendant continued the scheme by funneling $1 million to the U.S. President-Elect's inaugural committee to gain further access to, and influence with, incoming U.S. government officials.  In 2017 and 2018, the defendant continued his scheme, funneling hundreds of thousands of dollars of illegal and excessive campaign contributions into political committees through his friends and business associates in a further

effort to gain access to, and influence with, high-level elected officials.  And in 2019, to conceal the scheme, the defendant obstructed justice by telling a grand jury witness a false story about the defendant's business dealings and Nader's involvement in those dealings.

### A.     The Defendant's Status as a Fugitive

In November 2019, a federal grand jury sitting in the District of Columbia returned a fifty-three-count indictment charging the defendant and his co-defendants with crimes stemming from the above-described scheme.[1]  Before the indictment was returned, the defendant became aware of the investigation into his campaign-related crimes.

In August 2018, Special Agents from the Federal Bureau of Investigation ("FBI") attempted to execute a search warrant in the Central District of California for the defendant's person and personal effects, including any electronic devices in his possession.  The agents called the defendant, who declined to meet with the agents to turn over his phone.  The next day, the agents went to Allied Wallet, Inc., and waited for the defendant in the company's parking lot.  The defendant exited the building, saw the agents, and began to run down a major thoroughfare in Los Angeles.  The defendant successfully evaded agents' attempts to apprehend him and execute the warrant.  More than a week later, the defendant's counsel arranged for the surrender of the defendant's phone.  The phone, which had been purchased in August 2016, only contained three text messages and forty-six WhatsApp conversations, none of which were pertinent to the investigation, when it was surrendered.  Agents later found evidence that the defendant conducted an online search for "can you recover deleted text messages on iphone [sic]" and "How to Recover

---

[1] The defendant is charged separately in the District of Massachusetts in a single count superseding indictment charging him with conspiracy to commit bank fraud and wire fraud stemming from a $150 million payment processing scheme orchestrated by the defendant and other executives at the defendant's company, Allied Wallet, Inc.  *See United States v. Khawaja, et al.*, No. 21-cr-10250, ECF No. 150 (D. Mass. Sep. 26, 2023).

Deleted Text Messages."  Subsequently, evidence shows that the defendant began feeding cover stories designed to mask criminal wrongdoing to his co-conspirators and other potential witnesses against him.

In June 2019, as the investigation continued, the defendant left the United States for Lebanon, where he also maintained citizenship.[2]  For the past five years he has failed to return to the United States.  While abroad, the defendant left Lebanon and entered Lithuania where he was arrested.  The defendant then allegedly sought asylum in Lithuania.  Since arriving in Lithuania, the defendant has continued to actively fight extradition back to the United States.  As of the filing of this opposition, the prosecution team has no information about when the defendant's extradition proceedings will conclude, nor what the outcome of those proceedings will be.  The Lithuanian authorities currently require three so-called "coercive measures" to secure the defendant's presence in Lithuania - bail, a written commitment not to leave his place of residence, and an obligation to regularly register at a police station.  However, under Article 17 of the Protocol to the United States-Lithuania Extradition Treaty, the defendant may consent to waive extradition proceedings in Lithuania in writing and be surrendered to the United States "as expeditiously as possible without further proceedings."  If the defendant provided such consent, a Lithuanian court would review his waiver of extradition and confirm its veracity.  The court would then set a deadline for removal, and the defendant would be remanded into Lithuanian police custody. The United States Marshal's Service would then remove the defendant as soon as practicable back to the United States.  The defendant has thus far declined to waive extradition proceedings and continues to actively challenge removal to the United States.

---

[2] The United States did not then, and does not now, have an extradition treaty with Lebanon.  As far as the prosecution team is aware, Lebanon does not extradite its own citizens.

Evidence further shows that the defendant allegedly attempted to secure a fraudulent passport for himself while he remained abroad.  Specifically, in August 2020, agents with Customs and Border Protection ("CBP") intercepted the below fraudulent Mexican passport, that contained the defendant's last name and photograph, and was shipped from Mexico City, Mexico, to Barranquilla, Colombia.  The fraudulent passport was re-released and presumably delivered to its intended recipient in Colombia. To date, the below passport does not appear to have been used.



On February 5, 2020, as a result of the defendant's failure to return to the United States, Judge Ellen S. Huvelle, in her capacity as Chair of the Calendar and Case Management Committee of the District Court for the District of Columbia, declared that the defendant was a fugitive and reassigned this case to the Calendar Committee.  ECF No. 43.  Consistent with Judge Huvelle's declaration, this Court has also referred to the defendant as "a fugitive" during the trial of two of his co-defendants:

> I think I've bent over backwards in this case to be as protective as I can to Mr. Khawaja's interests, and I've let his counsel appear for arguing privilege issues. I've spent many hours going through documents, meeting with his counsel and government counsel dealing with privilege issues.  But he is a fugitive, and I don't think that he has a right to basically have his counsel participating in a trial that is -- will have some bearing on his trial.

Tr. Transcript at 9 (Feb. 28, 2022).   In short, since November 2019, the defendant has unequivocally remained a fugitive and has actively resisted efforts to secure his return to the United States.

### B.      George Nader's Status

In June 2019, Nader was arrested on charges unrelated to this case.   *See United States v. Nader*, Arrest Warrant, ECF No. 19, No. 1:19-cr-201 (E.D.V.A. Jun. 3, 2019).   As this Court is well-aware, Nader has remained in custody since that time.   Nader pleaded guilty and was sentenced in that case.   *See id.*, at ECF Nos. 171, 196.   On July 22, 2020, Nader pleaded guilty to a one-count Information, charging a violation of 18 U.S.C. § 371, for his role in the above-described conspiracy with this defendant.   *United States v. Nader*, ECF No. 9, No. 1:20-cr-103 (D.D.C. Jul. 22, 2020). On July 18, 2023, this Court sentenced Nader to twenty months of incarceration to run consecutively with his sentence in the Eastern District of Virginia.   *Id.* at ECF No. 87.   The Bureau of Prisons currently projects Nader to be released on February 6, 2025.

As a provision of Nader's Judgement and Commitment Order in the Eastern District of Virginia, Nader was permitted to self-deport once released from incarceration.   ECF No. 197, No. 1:19-cr-201.   However, this Court imposed the additional requirement that Nader appear for a reentry hearing within sixty days of his release from incarceration.   Judgement and Conviction Order, ECF No. 87, No. 1:20-cr-103.

### C.      Nader's Role in the Defendant's Conspiracy

Nader was one of the defendant's co-conspirators in carrying out the schemes charged.   As part of his guilty plea, Nader admitted his involvement in working with the defendant to funnel more than $3.5 million originating from Nader and/or a foreign government into political committees supporting one of the candidates for President in 2016.   *See* Statement of Offense,

ECF No. 10, No. 1:20-cr-103.  In doing so, the defendant and Nader sought to gain access to and influence with the Presidential candidate and other high-level U.S. government officials.  *See id*. Nader admitted, among other things, that he and the defendant conspired to conceal their crimes by using encrypted messaging, coded language, and a fake licensing agreement.  *See id*.

As a consequence of the defendant's continued fugitive status, including the fact he has not been arraigned, the prosecution team has had no reason to make any determinations about whether Nader would be called as a government witness if this case ever were to proceed to trial.  The prosecution team has not produced discovery, including discovery related to Nader, to the defendant while the defendant remains a fugitive.  The prosecution team further submits that discovery should not be provided to the defendant until he is under the Court's jurisdiction because the Court's Protective Order, *see* ECF No. 18, remains unenforceable against the defendant while he remains in fugitive status.[3]

## II.   ARGUMENT

The defendant seeks three forms of relief from the Court.  *See* ECF No. 250.  First, the defendant asks the Court to designate Nader as a material witness for trial, pursuant to 18 U.S.C. § 3144.  *Id*. at 1.  Second, the defendant asks the Court to order Nader to sit for a deposition, pursuant to Federal Rule of Criminal Procedure 15, or alternatively, to detain Nader indefinitely until the defendant decides to come back to the United States.  *See id*.  Third, the defendant asks the Court to order the government to produce discovery related to Nader while the defendant

---

[3] Local Criminal Rule 5.1 makes clear that the government's disclosure obligations begin after a defendant has been arraigned: "Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known."  Since the defendant, here, has not been arraigned, the Court should not require the government to prematurely produce any criminal discovery.

remains comfortably outside of the Court's jurisdiction. *See id*. Defendant's arguments in support of his requested relief lack merit, and the Court should deny his motion in its entirety.

First, the defendant should be precluded from seeking any relief from this Court while he remains a fugitive under the fugitive disentitlement doctrine. Second, even if the Court finds that doctrine does not apply, the defendant has not presented sufficient evidence to meet the requirements necessary to order a Rule 15 deposition. Moreover, Rule 15 does not require premature and unprotected disclosure of all discovery to a defendant. Third, whether it is appropriate to designate Nader as a material witness for trial is unripe for judicial decision since the defendant has not entered a plea in this case, let alone even been arraigned. The defendant's motion should be denied.

### A.      The Fugitive Disentitlement Doctrine

In *Molinaro v. New Jersey*, 396 U.S. 365 (1970) (per curiam), the Supreme Court dismissed an appeal because state authorities considered the appellant a fugitive after he failed to surrender himself following a conviction and state-level affirmances. *Id*. at 365–66. In formulating what has come to be called the "fugitive disentitlement doctrine," the Court held, "While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims." *Id*. at 366. The Court later clarified, "the rule allowing dismissal of fugitives' appeals has rested in part on enforceability concerns, and in part on a 'disentitlement' theory that construes a defendant's flight during the pendency of his appeal as tantamount to waiver or abandonment." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 240 (1993). The Court also invoked deterrence, efficiency, and decorum principles in justifying the exercise of the disentitlement doctrine. *See id*. at 242 ("[D]ismissal by an appellate court after a defendant has fled its jurisdiction serves an

important deterrent function and advances an interest in efficient, dignified appellate practice."); *cf. United States v. Reese*, 993 F.2d 254, 256 (D.C. Cir. 1993) ("To reward the fugitive by granting his claim to a second helping of the court's limited resources would be perverse indeed.").  The Second Circuit has described four purposes of the fugitive disentitlement doctrine: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Empire Blue Cross and Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997).

The Supreme Court explained that power to invoke the fugitive disentitlement doctrine is grounded in Article III courts' "inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996); *see Daccarett-Ghia v. C.I.R.*, 70 F.3d 621, 623 (D.C. Cir. 1995) (describing fugitive disentitlement doctrine as deriving from a "court's authority to control its own proceedings."). The doctrine can be invoked, for example, "if the fugitive's status in some way prejudiced the government as a litigant by, for example, delaying any retrial, in which time the memory of prosecution witnesses could fade." *Daccarett-Ghia*, 70 F.3d at 623.  The primary limiting principle on the fugitive disentitlement doctrine is that there must be a connection between the individual's fugitive status and the case in which the sanction of disentitlement is enforced.  *See id*. at 626 ("If the individual's fugitive status has no 'connection' to the present proceedings in the sense that it neither affects the court's ability to carry out its judicial business nor prejudices the government as a litigant, the claim may not be dismissed.") (citing *Ortega-Rodriguez*, 507 U.S. at 249).

No district court in this Circuit has opined on the fugitive disentitlement doctrine's

applicability to a district court's consideration of a pretrial motion, as opposed to an appellate court's review of a conviction.  However, several district courts in other jurisdictions have used the doctrine to refuse to reach the merits of a fugitive's attempts to seek relief at the district court level while remaining outside of the court's jurisdiction and authority.  *See, e.g.*, *United States v. Kashamu*, 656 F. Supp. 2d 863, 866–68 (N.D. Ill. 2009) (denying motion to dismiss under fugitive disentitlement doctrine); *United States v. Oliveri*, 190 F. Supp. 2d 933, 935–36 (S.D. Tex. 2001) (denying motion to dismiss under fugitive disentitlement doctrine and noting, "[a]lthough the fugitive disentitlement doctrine is often invoked during the appellate process, it also applies to pretrial motions made by fugitives in the district courts."); *United States v. Eagleson*, 874 F. Supp. 27, 29–31 (D. Mass. 1994) (denying motion to vacate restraining order under fugitive disentitlement doctrine); *United States v. Stanzione*, 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975) (denying motion to dismiss and reasoning, "[w]hile, of course, defendant has not yet been convicted, until he is willing to submit his case for complete adjudication— win or lose— he should not be permitted to call upon the resources of the court for the determination of selective claims.").

The Supreme Court has made clear that a district court has broad discretion to fashion an appropriate sanction for a defendant's decision to become a fugitive from justice.  *See Ortega-Rodriguez*, 507 U.S. at 246 ("The contemptuous disrespect manifested by his flight was directed at the District Court, before which his case was pending during the entirety of his fugitive period. Therefore, under the reasoning of the cases cited above, it is the District Court that has the authority to defend its own dignity, by sanctioning an act of defiance that occurred solely within its domain.").  Moreover, the D.C. Circuit has expressed that a conviction is not a necessary prerequisite for a court to invoke the fugitive disentitlement doctrine:

> In truth and in fact appellants Dawkins and Schoop have not subjected themselves to the jurisdiction of this court. They have appeared by counsel only, and are willing to enjoy the fruits of any legal victory, but it is not apparent that they are willing to accept an adverse decree, and there is certainly no guarantee that they can be compelled to do so. As to how their pleas should be treated, although of course appellants have not been convicted of any charge here, we find a pertinent rationale in those cases in which the appellants have escaped confinement or jumped bail after conviction.

*See Dawkins v. Mitchell*, 437 F.2d 646, 648 (D.C. Cir. 1970). This Court should find that the fugitive disentitlement doctrine can be appropriately applied to the present motion.

The circumstances here satisfy the two-step analysis applied in *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021), to determine whether the facts of a case warrant the disentitlement doctrine's application. In *Bescond*, the Second Circuit held that to determine whether the fugitive disentitlement doctrine applies, a court must determine (1) whether the defendant is a fugitive, and (2) if disentitling the defendant would serve the doctrine's objectives. *Id.* at 771; *see also Kashamu*, 656 F. Supp. 2d at 867–68 (applying a similar two-step inquiry); *Oliveri*, 190 F. Supp. 2d at 936 (same).

### 1.  Defendant is Legally a Fugitive

The defendant in this case is a fugitive. The D.C. Circuit has not expressly defined the term "fugitive" in the context of the fugitive disentitlement doctrine. However, the Circuit has defined "fugitive" in another context by quoting the Supreme Court's decision in *Roberts v. Reilly*, 116 U.S. 80, 97 (1885):

> To be a fugitive from justice, in the sense of the act of congress regulating the subject under consideration, it is not necessary that the party charged should have left the state in which the crime is alleged to have been committed, after an indictment found, or for the purpose of avoiding a prosecution anticipated or begun, but simply that having within a state committed that which by laws constitutes a crime, when he is sought to be subject to its criminal process to answer for his offence, he has left its jurisdiction, and is found within the territory of another.

11

*McGowen v. United States*, 105 F.2d 791, 792 (D.C. Cir. 1939).

One D.C. district court simplified the Supreme Court's language by defining a "fugitive" as, "[a] criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony." *Liuksila v. Turner*, 351 F. Supp. 3d 166, 186 (D.D.C. 2018) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014)). Other courts have invoked the common law distinction between a "traditional fugitive" and a "constructive-flight fugitive." *See, e.g.*, *Bescond*, 24 F.4th at 771–72. A "traditional fugitive" is "[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." *Id*. (quoting BLACK'S LAW DICTIONARY (5th ed. 1979)). A "constructive-flight fugitive" is one "who allegedly committed crimes while in the United States but who w[as] outside the country—for whatever reason—when [he] learned that [his] arrest[ ] w[as] sought and who then refused to return to the United States in order to avoid prosecution." *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004).

Simply put, under any definition of the term fugitive utilized by this District and others, as described above, the defendant is a fugitive from justice. The defendant was unquestionably aware that he was under FBI investigation as early as August 2018. Since fleeing to Lebanon in June 2019, the defendant has made no effort to return to the United States. By his counsel's own admission, the defendant is aware of the charges against him. *See* ECF No 250 at 8 ("As noted, Mr. Khawaja has been actively involved in this case and in regular contact with the government."); *see also Kasahmu*, 656 F. Supp. 2d at 867 ("Since Kashamu has retained a Chicago law firm to represent him in this matter, and the only information the Court has regarding his whereabouts indicates that he may be somewhere in Nigeria, the Court can safely infer that Kashamu is aware

of the charges against him, and is purposefully absenting himself from the United States to avoid arrest and arraignment on the charges." (quotation marks omitted)).  Despite his awareness of the charges against him, the defendant has continued to fight extradition efforts to return him to the United States, including apparent attempts to secure a fraudulent Mexican passport.  His behavior described above demonstrates continuous efforts to avoid prosecution in the United States.

The defendant's arguments to the contrary are specious at best. For example, he claims that from December 2019 until August 2020 he was not a fugitive because he was merely delayed in returning to the United States due to the onset of the COVID-19 pandemic and his stated desire to visit his family.  ECF No. 250 at 6–7.  The defendant conveniently fails to explain, however, how his stated excuses override his obligations to return to the United States to face prosecution— particularly when he admits that COVID-related flight restrictions in Lebanon were in effect only between March 2020 and July 2020.  *See id*. at 7.  Even accepting the defendant's factual representations at face value, he cites no case law that would support the proposition that one is not a fugitive from justice if one voluntarily chooses to attend a months-long international business trip and visit their family instead of returning to the United States to face criminal charges.

The defendant makes an equally meritless argument, again citing no authority in support, that because he has been subject to Lithuanian authority for the last three and a half years that he cannot be considered a fugitive.  *Id*. at 6.  As explained above, the defendant could, at any time, waive extradition proceedings and promptly return to the United States.

Finally, both this Court and Judge Huvelle have identified this defendant as a "fugitive" in the course of official proceedings in this case.  *See supra*, Section I-B.  The Court and Judge Huvelle undoubtedly understood the definition and significance of that nomenclature when it was used.  And the defendant has not presented any argument that would undermine what this Court

has already determined: the defendant is a fugitive.

2.   Doctrine's Objectives are Served by Disentitling Defendant

As described above, the Supreme Court has identified interests of deterrence, efficiency, and decorum as foundational principles undergirding the importance of the fugitive disentitlement doctrine.  *See Ortega-Rodriguez*, 507 U.S. at 242.  Each of these three objectives are served by applying disentitlement in this case.

Here, the defendant used his substantial means and foreign ties to successfully flee from justice and has remained overseas, voluntarily, because he has the resources and connections to do so.  By applying disentitlement here, the Court would send a strong deterrent message to others similarly situated that courts will not allow defendants to use their resources to remain overseas and avoid a court's authority while also seeking favorable outcomes for themselves in the United States.  In addition, applying disentitlement will allow this Court to not waste precious judicial resources on motion practice for a case that may never be resolved.  Undoubtedly, if this Court does not apply disentitlement, the defendant will begin engaging in significant motion practice seeking more relief from the Court that will put him in a better posture.  And if the Court's decisions on the merits of those motions are undesirable to the defendant, he can simply choose to continue fighting extradition.  Because the Court has no assurances that the defendant will ever return to the United States, it should, in the interests of judicial economy, apply disentitlement here.  Finally, for the sake of decorum, the Court should not permit this defendant to do what the D.C. Circuit frowned upon in *Dawkins*.  *See* 437 F.2d at 649 ("appellants [should not be able] to invoke only half our jurisdiction, i.e., the winning side.").

Moreover, the government submits that the defendant should not be awarded a windfall by being allowed to pick and choose issues he wishes to litigate all-the-while the government remains

prejudiced by his decision to remain a fugitive.  *See Finkelstein*, 111 F.3d at 280 (describing four purposes of the fugitive disentitlement doctrine as "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) *avoiding prejudice to the other side caused by the defendant's escape*." (emphasis added)). Indeed, some of the conduct at issue here occurred more than eight years ago.  While much of the evidence in this case is documentary, witnesses may be called to testify if this case goes to trial, and the defendant may seek to challenge the memories of those witnesses.  Application of the disentitlement doctrine will ensure that the defendant is not further benefited, and the government not further prejudiced, by his continued fugitivity.[4]

The defendant's sole argument that the objectives of the disentitlement doctrine are not served by its application here is that the defendant continues to abide by Lithuanian authorities' conditions of release, and thus "there are no grounds to find that Mr. Khawaja would not abide by decisions of this Court."  *See* ECF No. 250 at 8.  He asserts that there is "no need to impose a penalty."  *Id*.  Putting aside that the defendant fails to engage with any of the other objectives of the disentitlement doctrine, his argument about compliance with Lithuanian conditions of release falls flat.  The defendant again ignores that he can waive extradition at any time and that his compliance with the Lithuanian conditions of release is a requirement to maintain his challenge to extradition.  The defendant is not within this Court's jurisdiction and is under no obligation to follow any of this Court's rulings.

---

[4] The government submits that the other purposes of the disentitlement doctrine described in *Finkelstein* – 1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts—are also furthered by the Court applying the doctrine in this case.

In short, the fugitive disentitlement doctrine's application in this case would serve every purpose outlined by courts that have applied the doctrine, including the Supreme Court.  The Court should exercise its discretion by not rewarding the defendant for continuing to avoid this Court's authority.  The defendant's motion, in its entirety, should be denied.

### B.  Rule 15 Deposition

Should the Court choose to reach the merits of the defendant's motion, the portion of the motion seeking to depose George Nader and for premature discovery should nevertheless be denied because the defendant has failed to meet the requirements of Federal Rule of Criminal Procedure 15 and misinterprets the Rule's proviso about discovery production.   Rule 15(a) provides that,

> A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice. If the court orders the deposition to be taken, it may also require the deponent to produce at the deposition any designated material that is not privileged, including any book, paper, document, record, recording, or data.

"The purpose of Rule 15(a) is to preserve testimony for trial, not to provide a method of pretrial discovery."  *United States v. Kelley*, 36 F.3d 1118, 1124–25 (D.C. Cir. 1994) (quotation marks omitted); *see also United States v. Warren*, 713 F. Supp. 2d 1, 3 (D.D.C.2010) ("Rule 15 permits depositions in a criminal case to preserve testimony, not to foster discovery, and only in exceptional situations.").   "There is a distinct preference for having witnesses in criminal trials present for the jury to view, to assess, themselves confront. The concept of having depositions is an inferior technique for presenting these witnesses to a jury."  *United States v. Sanford, Ltd.*, 860 F. Supp. 2d 1, 3 (D.D.C. 2012) (quoting *United States v. Ismaili*, 828 F.2d 153, 156 (3d Cir. 1987)).  Because of the inferior nature of deposition testimony in criminal cases, the proponent of the deposition must establish that (1) exceptional circumstances exist justifying the deposition and

(2) ordering the deposition would be in the interest of justice.  *See* Fed. R. Crim. P. 15(a); *Kelley*, 36 F.3d at 1124–25; *United States v. Vo*, 53 F. Supp. 3d 77, 82–83 (D.D.C. 2014).  Here, the Court should reject the defendant's ill-disguised attempt to use a Rule 15 deposition to gather discovery while evading the Court's jurisdiction.  Indeed, the defendant has failed to present sufficient proof that exceptional circumstances exist and that ordering a deposition would be in the interests of justice.

### 1.   Exceptional Circumstances

It is the party who moves to take the deposition that "bears the burden of demonstrating that 'exceptional circumstances' necessitate the preservation of testimony through a deposition." *Kelley*, 36 F.3d at 1124.  The D.C. Circuit requires consideration of at least two factors in assessing whether the "exceptional circumstances" requirement has been met: (a) the materiality and exculpatory nature of the testimony sought and (b) the unavailability of the witness to testify at trial.  *Id*. at 1125; *Sanford, Ltd.*, 860 F. Supp. 2d at 4.

### a.   *Materiality and Exculpatory Nature*

In assessing whether a defendant seeking to depose a witness has established that the testimony sought is material and exculpatory, "courts have applied the standards for material and exculpatory information developed in the caselaw interpreting *Brady v. Maryland*, 373 U.S. 83 (1963)." *Sanford, Ltd.*, 860 F. Supp. 2d at 4.  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone v. Bell*, 556 U.S. 449, 469–70 (2009).  "[T]he offering party must show that, with the witness's testimony, the likelihood of a different result is great enough to undermine confidence in the outcome of the trial."  *United States v. Trabelsi*, No. 06-CR-89 (RDM), 2023 WL 4341429, at *2 (D.D.C. Apr. 5, 2023) (quotation marks omitted).

"[T]he purpose of Rule 15 is testimony preservation and not discovery, such that an unavailable witness's testimony should be material to the case of the party seeking the deposition." *United States v. Little*, No. 12-CR-00647 ALC, 2014 WL 3604417, at *2 (S.D.N.Y. Jul. 16, 2014).

Significantly, "there is typically some showing beyond 'unsubstantiated speculation,' that the evidence exculpates the defendant." *Kelley*, 36 F.3d at 1125 (citing *Guam v. Ngirangas,* 806 F.2d 895, 897 (9th Cir. 1986); *United States v. Wilson,* 601 F.2d 95, 97 (3d Cir. 1979); *United States v. Ontiveros–Lucero,* 621 F. Supp. 1037, 1038 (W.D. Tex. 1985), *aff'd,* 790 F.2d 891 (5th Cir. 1986)). "Testimony that offers only 'general observations,' as opposed to direct or circumstantial evidence, is not considered material or exculpatory." *United States v. Warren*, 713 F. Supp. 2d 1, 4 (D.D.C. 2010) (citing *United States v. Straker*, 567 F. Supp. 2d 174, 181–82 (D.D.C. 2008)). In addition, the evidence must not merely be "corroborative or cumulative of other evidence." *Vo*, 53 F. Supp. 3d at 82.

In *Sanford, Ltd.*, the court denied the defendants' request to depose two witnesses when the defendants failed to establish anything beyond speculation about what testimony those witnesses would provide that would be material and exculpatory to the defendants. 860 F. Supp. 2d at 12–13. While acknowledging that a defendant is not strictly required to produce an affidavit from the proposed deponent, the court found that "the lack of such declarations is indicative of the lack of foundation for the pre-trial depositions of these two individuals." *Id*. at 12. The court explained, "[g]iven that the defendants have had no contact with [the proposed deponents], the defendants' representations as to the evidence that [the proposed deponents] will provide, and to their alleged unavailability, is pure speculation." *Id*. The court held, "[t]he lack of support for the defendants' position alone warrants denial of the defendants' request to depose the [the witnesses]." *Id*.

The defendant, here, fails to offer any binding or analogous precedent in support of his position.  Rather, the defendant's attorney offers only the conclusory claim, "[b]ased upon my investigation to date, I anticipate Mr. Nader will be the source of substantial exculpatory evidence."  Affidavit of Kenneth Julian, ECF No. 249 at 7.  As the proponent of the deposition, the defendant must do more than offer bare, conclusory claims about the materiality and exculpatory nature of the witness's testimony.  Just as the court did in *Sanford, Ltd.*, this Court should find that this conclusory statement fails to establish anything beyond speculation about the materiality of Nader's testimony to the defendant's defense.  Accordingly, the defendant has failed to meet this requirement, and thus, has failed to show that exceptional circumstances warrant deposing Nader.

### b.    *Unavailability*

The defendant has similarly failed to show that Nader will be unavailable for live testimony at trial.  "A witness's unavailability in the context of Rule 15(a)(1) is defined by reference to Federal Rule of Evidence 804(a), which provides, in relevant part, that a witness is unavailable if he or she is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."  *Sanford, Ltd.*, 860 F. Supp. 2d at 4 (cleaned up).  "Unavailability is to be determined according to the practical standard of whether under the circumstances the [party seeking to take the deposition] has made a good-faith effort to produce the person to testify at trial."  *Id.* (quoting *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984)).  "[A] witness is 'unavailable' for purposes of Rule 15(a) if 'a substantial likelihood exists that [he] . . . will not testify at trial.'"  *Trabelsi*, 2023 WL 4341429, at *3 (quoting *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993)).  In addition, "[a] witness who resides abroad and outside the reach of a court's subpoena power is not automatically 'unavailable'

without a further showing that he or she will not testify in court." *Warren*, 713 F. Supp. 2d at 4. Even for witnesses residing in foreign countries, "[t]he burden is on defendant to procure their attendance by 'reasonable means' and resort to relief under Rule 15 if his procurement attempts fail." *Id*.

One particular provision of Rule 804(a) is particularly relevant to the unavailability analysis in this case. Rule 804(a) states, in part, "[b]ut this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying." While the government has identified no authority in this Circuit that has applied this portion of Rule 804(a) to a Rule 15 unavailability analysis, the government encourages the Court to consider it, here. As explained above, the defendant has been a fugitive since 2019. Since that time, Nader has pleaded guilty in this case and has been incarcerated. Thus, for the entirety of the time the defendant has decided to remain a fugitive from justice, Nader has been available for live testimony at a trial for the defendant. It is only by the defendant's own choices and actions that the prospect of Nader leaving the United States before the defendant's trial has become a possibility. In other words, even if Nader is or will become unavailable, it is the defendant who wrongfully caused that unavailability by remaining a fugitive for more than four years. The defendant should not be able to cause the potential unavailability and subsequently seek relief predicated on that unavailability.

Here, the defendant has failed to meet his burden in proving that Nader will be unavailable at trial. Specifically, the defendant has provided no affidavit from Nader or his counsel attesting that Nader will defy this Court's order to appear for a reentry hearing. Nor has the defendant provided any evidence that Nader would be unwilling to voluntarily come back to the United States if called upon to testify.

Moreover, the government underscores that approximately seven months remain between the date of this filing and Nader's projected release.  If the defendant believes that Nader's testimony will exculpate him, he could, of course, return to the United States, enter a plea of "not guilty," and request a trial date before Nader's release.  But as defense counsel admitted, "[t]here is currently no date set for Mr. Khawaja's return to the United States."  Affidavit of Kenneth Julian, ECF No. 249 at 8.  Accordingly, the defendant has failed to show a substantial likelihood that Nader will be unavailable for trial, and thus, has failed to prove that exceptional circumstances warrant taking his deposition.

2.   Interest of Justice

In addition to failing to establish exceptional circumstances warranting the deposition, the defendant has failed to establish that ordering Nader's deposition would be in the interest of justice. As one district court explained in regard to the "interest of justice" component of Rule 15(a),

> Some courts have read this to mean that courts should consider countervailing considerations. *See, e.g.*, *United States v. Aggarwal*, 17 F.3d 737, 742 (5th Cir. 1994) (considering untimeliness of request); *Drogoul*, 1 F.3d at 1555.  The D.C. Circuit has not addressed the issue. But the similarity of the standard ("in the interest of justice") to tests found elsewhere in the Federal Rules suggests that balancing countervailing considerations is appropriate.

*Vo*, 53 F. Supp. 3d at 82.  Although the Eleventh Circuit is the only Circuit that specifically requires addressing countervailing considerations, other courts have informally taken into account other considerations in conducting a Rule 15 analysis.  *See, e.g.*, *United States v. Mann*, 590 F.2d 361, 366 (1st Cir. 1978) (considering the admissibility of the testimony in determining whether a Rule 15(a) deposition is appropriate); *United States v. Bello*, 532 F.2d 422, 423 (5th Cir. 1976) (citing the overwhelming evidence of guilt offered by the prosecution as a reason for declining to allow a Rule 15(a) deposition).

There are several countervailing factors here, each of which make clear that the defendant's

request to depose Nader is not in the interest of justice.  First, and most significantly, the defendant is a fugitive.  He has provided this Court no timeline for his return to the United States and has attempted to place conditions on the Court for any appearance before the Court or for the deposition of Nader.  *See* ECF No. 250 at 6 ("Mr. Khawaja would be willing to appear before the Court from Lithuania via Zoom, if necessary.").  It would not be in the interest of justice for a fugitive to be permitted to develop his trial strategy through court-authorized means while continuing to refuse to submit to the Court's jurisdiction.

Second, the efficient use of precious court and taxpayer resources counsels against permitting the defendant to take Nader's deposition while the defendant continues to evade justice.  Indeed, conducting Nader's deposition would prove to be a waste of government, and potentially Court, resources if the defendant (1) returns to the United States and stands trial before Nader is released from custody; (2) never returns to the United States; or (3) returns to stand trial and Nader is available to be called as a witness at trial.  Accordingly, it is not in the interest of justice to waste taxpayer and judicial resources on this defendant's requests while he remains a fugitive.

The defendant does not cite any authority to support the proposition that ordering Nader's deposition would be in the interest of justice.  Instead, he once again makes only a conclusory claim that "The facts presented in the Julian Affidavit provide exceptional circumstances, and the interests of justice[.]"  ECF No. 250 at 4.  He provides nothing more to support this claim.  This cannot be enough to overcome the countervailing considerations that tend to show ordering a deposition of Nader would not be in the interest of justice.

Because the defendant fails to show that there are exceptional circumstances warranting a deposition of Nader and that Nader's deposition would be in the interests of justice, the Court should deny the defendant's motion.

3.      <u>Discovery</u>

The defendant makes a sweeping request that the Court order the government to produce "any discovery due under Federal Rule of Criminal Procedure 16, Brady, and Giglio, as it pertains to the Nader-related portions of the Indictment." ECF No. 250 at 5. He also suggests that he will likely request, "that Mr. Nader's phones be searched for custodians and exculpatory communications in support of Mr. Khawaja's defenses that may not have been covered or anticipated in prior government searches of those devices. Mr. Nader's counsel reports that the government investigation involved searches of 'six different phones.'" *Id.* at 4–5.

First, if the Court denies the defendant's request for a Rule 15 deposition, as the facts and law suggest it should, the defendant's discovery request is moot and should be denied. Second, the defendant's request goes far beyond the bounds of what Rule 15 requires. Specifically, when a defendant is the proponent of the deposition, Rule 15 requires the government to provide only "any statement of the deponent in the government's possession to which the defendant would be entitled at trial." Fed. R. Crim. P. 15(e)(3); *see United States v. Cooper*, 947 F. Supp. 2d 108, 116–17 (D.D.C. 2013) (rejecting defendant's claim that he was entitled to receive all discovery prior to Rule 15 depositions). Thus, even if the government is required to produce discovery, it should only be required to produce Nader's statements that are within the possession of the prosecution team. The government should not be required to, as the defendant suggests, essentially produce its entire discovery file that may, in some way, touch on pieces of the indictment involving Nader.

**C.      Material Witness Designation for Trial**

Finally, the Court should deny the defendant's request to designate Nader as a material witness for trial, under 18 U.S.C. § 3144. "A person apprehended as a material witness is not

accused of any crime but, instead, has been arrested because it is believed that his . . . 'testimony is material in a criminal proceeding.'" *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 215 F. Supp. 2d 94, 106 (D.D.C. 2002), *aff'd in relevant part*, 331 F.3d 918 (D.C. Cir. 2003) (quoting 18 U.S.C. § 3144). The defendant has failed to establish that Nader is a material witness because he has failed to establish the materiality of Nader's testimony to his defense, as articulated above in Section II-B-1-a. The defendant only parrots the indictment, instead of providing this Court with any explanation of how Nader is material to *his defense at trial*.

In addition, principles of justiciability warrant rejecting the defendant's request to designate Nader as a material witness for trial at this time. Section 3144 requires the proponent to identify "a criminal proceeding" at which the witness's testimony will be material. The plain meaning of the phrase "a criminal proceeding" is a specific "criminal hearing or trial." *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining criminal proceeding as "A judicial hearing, session, or prosecution in which a court adjudicates whether a person has committed a crime or, having already fixed guilt, decides on the offender's punishment; a criminal hearing or trial."); *see also* Fed. R. Crim. P. 17 (requiring subpoena to state the "title of the proceeding"). Throughout the defendant's motion and his counsel's affidavit, it is clear that the specific "proceeding" at which they claim Nader's testimony will be material is the defendant's trial. *See, e.g.*, ECF No. 250 at 5 ("In order to take an effective deposition, especially one intended to substitute at trial for Mr. Nader's live testimony . . . .).

Issues pertinent to a potential trial of the defendant are unripe for consideration in this case. "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). A matter is ripe

for judicial review "when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues . . . [and] there is no doubt whatever that [the issue] has crystallized sufficiently for purposes of judicial review." *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002) (citation omitted). A matter is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted). In addition to constitutional ripeness concerns, "prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012). The prudential ripeness of a matter is determined by consideration of whether the issue is fit for judicial decision and the extent to which withholding decision will cause hardship to the parties. *See id.* While ripeness is often invoked in the context of bringing an administrative or civil action, courts have applied the doctrine to determinations of specific matters in criminal cases. *See, e.g.*, *United States v. Kember*, 648 F.2d 1354, 1362 (D.C. Cir. 1980) (rejecting Fifth and Sixth Amendment challenges brought by witnesses being held in contempt of court because those challenges were brought too soon).

Here, the defendant cannot plausibly claim that designation of Nader as a material witness *for trial* is ripe for consideration given the surrounding speculation and uncertainty regarding whether the defendant will actually stand trial in this case given his continuing efforts to evade justice. The defendant has not yet taken the preliminary step that triggers the potential for a trial— entering a plea of "not guilty" in this case. As Federal Rule of Criminal Procedure 10 requires, a defendant must enter a plea to the indictment brought against him. Fed. R. Crim. P. 10(a)(3). "A defendant may plead not guilty, guilty or, with the consent of the court, nolo contendere." *United States v. Gray*, 448 F.2d 164, 167 (9th Cir. 1971). The Supreme Court has held that a proper

arraignment is a necessary prerequisite to a trial in a criminal case.  *See Hamilton v. State of Ala.*, 368 U.S. 52, 54 n.4 (1961) ("Under federal law an arraignment is a sine qua non to the trial itself—the preliminary stage where the accused is informed of the indictment and pleads to it, thereby formulating the issue to be tried.").  And as the Supreme Court made clear, a matter is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas*, 523 U.S. at 300.

Accordingly, the Court should deny the defendant's request to designate Nader as a material witness for trial.

### D.    Status Conference

Finally, the government respectfully submits that in light of the forgoing, a status conference on the defendant's motion is unnecessary, and the Court should apply the fugitive disentitlement doctrine to deny the defendant's motion in its entirety.   Nevertheless, the government acknowledges that the Court has already granted the portion of the defendant's motion seeking a status conference and will be present and prepared to address the issues herein should the Court's Order remain unchanged.  Minute Order (May 30, 2024).

### III.    CONCLUSION

Until the defendant returns to the United States, he should be afforded no relief from this Court.  His motion, whether considered on the merits or under the fugitive disentitlement doctrine, should be denied.

Respectfully submitted,
COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:     */s/ Jordan Dickson*
        **Jordan Dickson**
        Trial Attorney
        CA Bar No. 324406
        **Trevor Wilmot**
        Trial Attorney
        GA Bar No. 936961
        Public Integrity Section
        Criminal Division
        U.S. Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

Dated:  June 13, 2024                         */s/ Jordan Dickson*
                                              Jordan Dickson
                                              Public Integrity Section
                                              Criminal Division
                                              U.S. Department of Justice