## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:19-cr-00374 (RDM) |
| AHMAD "ANDY" KHAWAJA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ANDY KHAWAJA'S REPLY TO UNITED STATES' OPPOSITION TO MOTION TO DESIGNATE MATERIAL WITNESS PURSUANT TO 18 U.S.C. § 3144, AND FOR DEPOSITION OR, IN THE ALTERNATIVE, DETAINMENT**

### I. INTRODUCTION

The government's Opposition to the Motion to Designate George Nader as a Material Witness Pursuant to 18 U.S.C. § 3144 "doth protest too much."  The government's real purpose is to block Mr. Khawaja from accessing and preserving exculpatory testimony for use at trial, about which the government pretends not to know.  This Motion is filed out of necessity to preserve exculpatory testimony from a key witness and alleged co-conspirator, George Nader.  Such testimony is at risk of being lost since Mr. Nader will very likely self-deport to the Middle East, and never return to the United States.  Successfully obtaining his passport from the Eastern District of Virginia was the first step to absenting himself from the United States.

The Opposition relies upon a slate of inaccurate "facts" stated *ipse dixit* largely without attribution to source or citation of record with the aim of barring the present motion (the "Motion") under the fugitive disentitlement doctrine (the "FDD").  The Court should critically evaluate the factual assertions in the Opposition and, if necessary, hold an evidentiary hearing, as the government invites the Court to proceed on an incorrect and incomplete factual record.

In truth, as the government well-knows:

(1)  Mr. Nader is a material witness with first-hand knowledge of exculpatory facts going to the heart of the charges against Mr. Khawaja, and which contradict primary allegations in the Indictment.

(2)  In June 2019, Mr. Khawaja traveled from Los Angeles to *London— not Lebanon*—when he was called to meet with the UK's Financial Conduct Authority to answer urgent investigation questions concerning his UK-based business, Allied Wallet, Ltd.

(3)  Mr. Khawaja has made vigorous efforts to return to the United States to face the charges; he is willing to return to the United States (and follow this Court's orders); and he has demonstrated four years of compliance with Lithuanian bail conditions, including three years of intensive supervision by electronic monitoring, as well as the past eight months of relaxed release conditions *without* electronic monitoring, despite being less than one hour from two countries without extradition treaties (Russia and Belarus) and similar distances to two others (Poland and Latvia).

As discussed below, under the unique facts of this case, Mr. Khawaja does not fit neatly into any category of "fugitive" because he did not flee to Lebanon in June 2019, as posited by the government, and because he is actively seeking—*not refusing*—to return to the United States to face the charges.  In attempting to address bail in advance, Mr. Khawaja is not seeking any special favors, or to name his own terms; rather, he is seeking only that which the government

has recently accorded other, similarly situated defendants in extradition proceedings: a fair evaluation of the respective rights of the parties under the Bail Reform Act.  Courts have declined to apply the FDD under unique factual circumstances such as those presented here.

## II.  MR. KHAWAJA HAS MET HIS BURDEN UNDER SECTION 3144 AND RULE 15

### A.  Mr. Nader's Status as a Material (Exculpatory) Witness.

In the Opposition, the government claims that Mr. Khawaja "failed to establish that Nader is a material witness because he has failed to establish the materiality of Nader's testimony to his defense" (Opp. at 24) and claims that his possession of exculpatory information is "unsubstantiated speculation" (Opp. at 18).  The government's position is not well-taken, and it knows as much.

On October 23, 2023, before burdening the Court with this Motion, Mr. Khawaja provided the government with copies of representative exculpatory communications to and from Mr. Nader and explained their significance to the defense case.  In the weeks that followed, Mr. Khawaja sought the government's stipulation for him to take Mr. Nader's deposition, but was unsuccessful in doing so.

The specific communications provided to the government —*in Mr. Nader's own words*— articulate that the funds he sent from his company to Mr. Khawaja's company were for a *business purpose*—not for illicit campaign donations:

> "As per our conversation and agreement for ***consultation and services provided by your company*** kindly send me the bill … so we can take care of it ASAP! … As already mentioned ***half of the 10 [million] to be paid upon receipt and second half by 15 August***."

> (6/14/2016 Mssg. Mr. Nader to Mr. Khawaja) (emphasis added).

The surrounding conduct and communications tend to show that this was not, as the government alleges, a one-off, cover-your-tracks communication to buttress a "Fake Commercial Transaction."  (Indictment, p.10, Dkt. #1.)  On the contrary, such conduct and communications show a bona fide commercial transaction: from March to May 2016, Mr. Khawaja made three trips to the UAE to meet with Mr. Nader and UAE officials regarding an investment in a Virtual Shopping Mall.  About this, Mr. Nader communicated in writing: (a) "Andy's dream is to … develop a Global Virtual Mega Mall based in Emirates," (b) "Andy is in Dubai to *prepare recruitment and logistics*" for the same; (c) UAE's Ruler wanted the "headquarters based in [Abu Dhabi]," (d) the "plan" was to "set up Headquarters in [Abu Dhabi] and develop global partnership from here," and (e) the UAE's Ruler had a "willingness … to facilitate and help with *whatever it takes to get the <u>business going</u>!*"  (Sample Nader-Khawaja Communications 3/7/2016 to 4/8/2016) (emphasis added).[1]

In these messages, Mr. Khawaja explained that the project "will start slow because *it's [software] development work* and not sales … So at the start *we need to be very careful with the local [computer] code put in* … Start could be *5 staff then build up to 75 team of professionals*."  (4/3/2016 Mssg. Mr. Khawaja to Mr. Nader) (emphasis added).  And, there are scores of additional corroborating communications among Allied Wallet staff and with Mr. Nader, as also discussed with the government.  Furthermore, Mr. Khawaja has other specific exculpatory evidence supporting the defense theory, which can be detailed to the Court *in camera* and under seal, if necessary.

---

[1]  Mr. Khawaja will lodge copies of such emails with the Court under seal prior to the hearing.

The referenced Nader-sent-and-received communications undermine the Indictment's central allegation that more than $3.5 million was "funneled" to Mr. Khawaja to make conduit campaign contributions.  (Indictment, ¶¶ 22-28, Dkt. #1.)  If the defense proffered evidence and inferences are believed, and the government's narrative doubted, a jury may acquit Mr. Khawaja of the criminal charges, as they relate to conduct with Mr. Nader.  As such, Mr. Nader likely has admissible, material, and exculpatory information within the meaning of *Brady*, which presumably can be preserved for trial in a deposition, if the Court were to so order.

### B.  Mr. Khawaja Has Adequately Shown that It *May* Become Impractical to Secure Mr. Nader's Presence at Trial.

By its clear terms, Section 3144 expressly authorizes a deposition where: (1) "the testimony of a person is material in a criminal proceeding," (2) "it may become impracticable to secure the presence of the person by subpoena," and (3) "the testimony of such witness can adequately be *secured by deposition*."  18 U.S.C. § 3144 (emphasis added).  Moreover, in the context of a material witness, Section 3144 and Rule 15(a) must be read in conjunction.  "Although Rule 15(a) employs the permissive 'may,' not the mandatory 'shall,' *when read in conjunction with section 3144* it limits discretion to deny motions to depose material witnesses to instances in which the deposition would not serve as an adequate substitute for the witness' live testimony and a 'failure of justice' would ensue were the witness released."  *United States v. Huang*, 827 F. Supp. 945, 948 (S.D.N.Y. 1993) (emphasis added).

In the Opposition, the government fails to mention or discuss Section 3144's statutory standard—providing relief "if it is shown that it *may become impracticable* to secure the presence of the person by subpoena" (which Mr. Khawaja has done), in favor of applying Rule

15's arguably higher standard of "unavailability." (Opp. at 19-21). The Court should decline the government's invitation to ignore Section 3144, and follow Rule 15 as if the present motion was not also brought under Section 3144. *Huang*, 827 F. Supp. 945, 948.

In the Motion, Mr. Khawaja met his burden under Section 3144. The Opposition does not dispute Mr. Khawaja's evidence as to impracticality: that Mr. Nader recently sought and received the return of his passport; has expressed a deep desire to return to the Middle East to be with long missed friends and family; and self-deporting from the United States relieves Mr. Nader of the burden of living under intensive sex offender supervision. Each of these, alone and standing together, demonstrate that "it may become impracticable to secure the presence of [Mr. Nader] by [a] subpoena" since he will very likely be living beyond its reach.

The government speculates—without any factual support—that Mr. Nader might voluntarily return to the United States to testify at trial. (Opp. at 20). But, this is extremely unlikely, if not inconceivable, based upon the court record. At sentencing, Mr. Nader's counsel expressed that Mr. Nader and his team felt mislead because the government asked him to return to the United States to cooperate under an immunity agreement and, once here, he was unexpectedly charged with older, unrelated criminal conduct:

> [Mr. Nader's counsel] negotiate[d] an immunity agreement, the government then takes conduct that they already know about – okay. So in other words, anything that Mr. Nader says – they get him to come over here, testifies in front of the grand jury under this grant of immunity, but then when it's wrapped up and he's done everything he's supposed to, they still want to use him.
>
> *So then they go and they charge him with something they already knew about and had been closed in 2009. That's not in the spirit of an immunity agreement.* Also, think about how that affects white collar lawyers advising people. *They say come back to the United States, you're going to testify under this grant of immunity, nothing is going to happen to you ….*

> *That is the one thing that Latham & Watkins -- they were outraged by it, and they were right.  That's not the right thing for the Department of Justice to do.  Yet, that's exactly what they did to him.*

> (1:20-cr-00103, Dkt. #90, 7/18/2023 Tr. at 90:8-20 and 91:2-5) (emphasis added).

This real or perceived betrayal constitutes yet another separate and independent reason for Mr. Nader to self-deport from the United States and not return.  Added to the other reasons already articulated, the facts sufficiently establish that there is a "substantial likelihood," after release from custody, Mr. Nader will "not testify at trial" within the meaning of Rule 15.  (*See* Opp. at 19) (""[A] witness is 'unavailable' for purposes of Rule 15(a) if 'a substantial likelihood exists that [he] . . . will not testify at trial.'" (quoting *United States v. Trabelsi*, No. 06-cr-89, 2023 WL 4341429, at *3 (April 24, 2023 D.D.C.).  Accordingly, even under the government's preferred standard, the Court should order Mr. Nader's deposition.

### III.  THE FDD SHOULD NOT BAR THE PRESENT MOTION

The cornerstone premise of the government's argument that the FDD should bar the present Motion is that, after becoming "aware that he was under FBI investigation," Mr. Khawaja "*fle[d] to Lebanon in June 2019*," and "since [then] … [Mr. Khawaja] has made *no effort to return* to the United States."  (Opp. at 12) (emphasis added).  Both of these assertions are untrue.

The government also misdescribes Mr. Khawaja's release conditions in Lithuania and downplays his nearly four-year record of compliance, including successfully completing three years of intensive supervision.  And, it relies upon cases with inapplicable factual contexts: flight *post-conviction*; civil and asset forfeiture cases; and absent defendants seeking to *dismiss Indictmen*ts *from afar*.  None of these situations are applicable here.

As discussed below, unique facts are presented—Mr. Khawaja is (and has been) actively seeking to return to the United States to defend himself at trial and has proved over the past four years his willingness and ability to comply with court orders—hence, this motion to preserve exculpatory evidence for use at trial.  Courts have used discretion to decline to apply the FDD when its application is not in the interest of justice and does not "serve the doctrine's stated objectives."  *See United States v. Cornelson*, 595 F. Supp. 3d 265, 270 (S.D.N.Y., 2022).

### A.  The Government's Incorrect and Unsupported Factual Assertions.

#### 1.  Mr. Khawaja traveled—*not fled*—to London—*not Lebanon*—in June 2019 for business.

The government writes: "In June 2019, as the investigation continued, the defendant left the United States for *Lebanon*, where he also maintained citizenship."  (Opp. at 4) (emphasis added).  A corresponding footnote emphasizes: "The United States did not then, and does not now, have an extradition treaty with Lebanon.  …. Lebanon does not extradite its own citizens." (Opp. at 4, n.2).  The government has its facts wrong.

On June 7, 2019, Noor Muhdi of the UK's Financial Conduct Authority ("FCA") requested Mr. Khawaja's presence at a meeting regarding Allied Wallet Ltd.  (Supplemental Affidavit of Kenneth B. Julian ("Supp. Julian Aff."), ¶ 7, Ex. D, 6/7/2019 Email Muhdi to Khawaja.)  On June 9, 2019, Mr. Khawaja traveled from Los Angeles to London—*not Lebanon*—to meet with the FCA to answer business-related questions the FCA deemed urgent. Mr. Khawaja's June 9, 2019, boarding pass shows that, on that date, he flew from Los Angeles to London:



Days later, on June 13, 2019, Mr. Khawaja met with Ms. Muhdi in the FCA's London office. Mr. Khawaja even took a photograph of himself at the office of the FCA on June 12, 2019. (*See* Supp. Julian Aff., ¶ 8, Ex. E.) After the meeting, Ms. Muhdi wrote to Mr. Khawaja stating:

> Thank you *for **coming in** to discuss with us the **urgent concerns we have***. We look forward to receiving the information we requested yesterday.
>
> (Supp. Julian Aff., ¶ 9, Ex. F, 6/13/2019 Email Muhdi to Khawaja) (emphasis added).

The emails, photo, and boarding pass convincingly show that Mr. Khawaja was called to London to meet with the FCA to discuss its "urgent concerns." For Mr. Khawaja, the cause was equally emergent because 95% or more of his credit card payments business was serviced from London. In fact, Mr. Khawaja visited the UK so often that he obtained a Residence Permit beginning in June 2015 and renewed it again in March 2019. (Supp. Julian Aff., ¶¶ 5-6, Exs. B, C.)

Mr. Khawaja resided in London—*not Lebanon*—through the end of November 2019, in order to defend the FCA enforcement proceedings.[2]  Mr. Khawaja continued to travel for business from London to Asia, Europe, or the Middle East, where he had clients.  Indeed, Mr. Khawaja regularly traveled and lived abroad several months per year, for business and personal reasons.  And, at the time in June 2019, Mr. Khawaja was *not* advised by DOJ to remain in the United States.  As of the time of his travels, Mr. Khawaja was not served with a summons and had no notice of an imminent Indictment.

As set forth in the Motion: in early December 2019, Mr. Khawaja learned of the Indictment while in Japan on business; he finished his business trip stopping in Singapore; went on to visit family in Lebanon via Doha; was *stuck there (airport closed) for nearly 5 months— March to July 2020—due to the global pandemic*; and then travelled to Lithuania in early August 2020 to visit family with the intention of next returning to the United States, at which time he was arrested at the request of the United States.  (*See* Supp. Julian Aff., ¶ 10, Ex. G, 12/1-30/2019 Monzo Bank Stmt.).

### 2. Mr. Khawaja's vigorous efforts to return to the United States to face the present charges.

The government's next premise—the assertion that Mr. Khawaja "has made *no effort to return* to the United States"—is equally untrue.  In fact, it's the opposite.  On approximately 18 separate occasions—during calls, in-person meetings, and email communications with various levels of DOJ decision-makers—counsel for Mr. Khawaja has sought to facilitate Mr. Khawaja's return to the United States.  In these conversations, defense counsel has conveyed, among other

---

[2]  On July 6, 2020, the FCA investigation ultimately terminated in Allied Wallet Ltd.'s favor.  (Supp. Julian Aff., ¶ 11, Ex. H, 7/6/2020 Ltr. FCA to Khawaja (formally "close[ing] the investigation" without "taking any further action")).

things, that Mr. Khawaja is seeking to return to the United States; that he intends to defend the case; that he is willing to waive valuable extradition rights;[3] and proposed possible terms consistent with the Bail Reform Act.  In fact, Mr. Khawaja's counsel has continually pestered the government about it, but at every turn, the government has rebuffed attempts to discuss in advance details about bail.  (*See* Supp. Julian Aff., ¶ 5, Ex. A, Summary of Bail-Related Discussions.)

Mr. Khawaja has not sought anything in return for his waiver of extradition beyond reasonable or fair conditions of release under the Bail Reform Act.  For example, on February 6, 2024, counsel for Mr. Khawaja proposed to reopen bail discussions, as follows:

> We are proposing to reopen discussions regarding bail. There are adequate resources for bail, including *real property security in the form of the home in Los Angeles, where his wife and son reside*. There is an *estimated $3 million or more of equity in the Khawaja family home*. All other defendants in both cases are on bail with personal recognizance bonds (except Nader who was in custody serving his child pornography possession sentence).

(2/6/2024 EM Julian to Dickson and Wilmot) (emphasis added).

DOJ prosecutors, however, have consistently conveyed that they cannot, or will not, discuss or consider bail conditions, and that it "comes from high up" and there is "no flexibility," and words to the effect.  Yet, DOJ recently agreed to bail conditions for the infamous and now convicted defendant Sam Bankman-Fried for his return from the Bahamas to the United States to face federal criminal charges for defrauding customers and lenders of *billions* of dollars.[4]  Even

---

[3]  The U.S. extradition treaty with Lithuania is only for "dual crimes."  Lithuania does not have campaign finance laws, nor does it prosecute "no loss" fraud cases, as Mr. Khawaja is charged with in Boston.

[4]  Jones, Jr., Royston, "Sam Bankman-Fried Is Set for Extradition to U.S.," THE NEW YORK TIMES (Dec. 21, 2022), https://www.nytimes.com/2022/12/21/technology/sbf-ftx-extradition.html ("Even before the extradition, *Mr. Bankman-Fried's legal team in the United States had been negotiating a possible bail package with federal prosecutors*. Under the terms that have been discussed, Mr. Bankman-Fried could be released on bail with highly restrictive conditions, including home detention and electronic monitoring.") (emphasis added); 1:22-cr-00673, Dkt. #14, 12/22/2022 Appearance Bond.

more recently, the government *stipulated* to bail conditions for another defendant while he was fighting extradition in the UK.[5]

Here, application of the FDD does not serve the interests of justice because the government is burdening Mr. Khawaja's practical ability to return to the United States by *selectively* refusing to discuss appropriate bail conditions, while at the same time using the fact that he's not here to block the present Motion under the FDD.  The purpose of the FDD is not served by such tactics.

### 3.   Mr. Khawaja does not fit the definition of "fugitive".

The government points out that, at an early stage, and presumably without the true facts, the Court declared Mr. Khawaja to be a "fugitive."  (Opp. at 5).  But, as has been shown, several aspects of being a fugitive do not apply to Mr. Khawaja, and key government facts are wrong. Mr. Khawaja did not "flee[] from [the] jurisdiction of [the] court where [a] crime was committed or depart from his usual place of abode," to avoid prosecution like a "traditional fugitive."  (Opp. at 12) (citing *United States v. Bescond*, 24 F.4th 759, 771–72 (2d Cir. 2021)).  Mr. Khawaja left the United States due to an FCA investigation, and to attend to his UK-based business.

Likewise, although Mr. Khawaja "w[as] outside the country—for [business] reason[s]— when [he] learned that [his] arrest[ ] w[as] sought," he is not "*refus[ing] to return* to the United States in order to avoid prosecution."  *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004).  On the contrary, he is seeking to waive extradition rights and return under fair and reasonable circumstances under the Bail Reform Act.

---

[5]  3:18-cr-00577, Dkt. #147, 5/11/2023 Notice of [Proposed] Order Setting Conditions of Release and Appearance Bond (indicating "the parties agreed to" the proposed release conditions).

Moreover, for almost *six of the nine months* between Indictment unsealing and arrest in Lithuania, Mr. Khawaja's travel back to the United States was either practically impossible because of airport closures, or highly inadvisable due to serious health risks (and early pandemic fear) associated with COVID.  A defendant is not a fugitive where their "presence abroad is unrelated to the American prosecution."  *Bescond*, 24 F.4th at 773.

On the other hand, while in Lithuania, Mr. Khawaja has resisted forceful return to the United States, in favor of attempting to engage the government to conduct a pre-extradition evaluation of appropriate bail terms, as it has done recently for other defendants.  More than that, Mr. Khawaja has relentlessly sought to return to the United States in this way.  None of the FDD cases the government relies upon have such facts.  There is an appearance that Mr. Khawaja is being selectively singled out by DOJ for harsher treatment than other similarly situated defendants in extradition proceedings abroad, which he is resisting and attempting to remedy via dialogue and negotiation—but Mr. Khawaja is clearly not "refusing to return" to the United States to avoid the current charges.

### 4.  Mr. Khawaja's actions demonstrate that he is not a flight risk.

The government contends, without any factual authority, that "defendant used his substantial means and foreign ties to successfully flee from justice and has remained overseas, voluntarily, because he has the resources and connections to do so."  (Opp. at 14)  The government seems to imply that Mr. Khawaja is on an extended holiday vacation.  Not so.

On September 3, 2020, Mr. Khawaja was arrested in Lithuania at the request of the United States.  (Affidavit of Rolandas Tilindis ("Tilindis Aff."), ¶ 3.)  For the next approximately two months, Mr. Khawaja was housed in a jail-like facility.  (*Id.*, ¶ 3.)  On October 28, 2020, he posted a bond of €700,000, was fitted with an electronic monitoring device, was required to

remain in his residence at night but allowed to travel within Vilnius, and was required to make "a written commitment not to depart from Lithuania," or enter "locations that cannot be visited," such as airports.[6]  (*Id.*, ¶¶ 5-6.)

On April 13, 2023, after approximately three years on "intensive supervision," the Lithuanian prosecutor commented in writing:

> "In response to your request to provide information about the precautionary measure imposed on your client Ahmad Khawaja … the Prosecutor's Office has *no information that Mr Khawaja has violated the conditions of the preventive measure imposed on him - intensive supervision*."
>
> (Supp. Julian Aff., ¶ 15, Ex. L, 4/13/2023 Letter from Prosecutor Jurga Zieniute) (emphasis added).

On October 23, 2023, Mr. Khawaja's release conditions were relaxed: electronic monitoring was removed and, in place of electronic monitoring: "On every Monday, Wednesday and Friday, between 10.00 a.m. and 3.00 p.m., [he must] register with Vilnius County Police Headquarters … ."[7]  For the past eight months, despite the close proximity to four international borders—two (Russia and Belarus) with *no extradition treaties* with the United States—Mr. Khawaja has not fled.  Mr. Khawaja's conduct over the past four years demonstrates that he is not seeking to evade justice and is not a flight risk.

---

[6] "Without permission of a prosecutor or a court, the person cannot departure from the Republic of Lithuania, must have permanent residence at Domininkonq g. 11-4, Vilnius, Lithuania, and must immediately appear before the prosecutor or the court when summoned. The suspect is obliged to not visit any of these locations: Vilnius airport, Kaunas airport, Palanga airport and other airports and aerodromes."

[7] In the Opposition, the government erroneously claims  that Mr. Khawaja is currently confined to his residence in Lithuania. (Opp. at 4). ("The Lithuanian authorities currently require three so-called 'coercive measures' to secure the defendant's presence in Lithuania - bail, *a written commitment not to leave his place of residence*, and an obligation to regularly register at a police station") (emphasis added).

### 5.  The FBI's botched search warrant/Unused alleged Mexican passport.

The facts with respect to the execution of a search warrant for Mr. Khawaja's phone and the Mexican passport are unpersuasive and, here again, the government significantly mischaracterized events and proffers unmeritorious inferences:

### a.  The FBI's botched search warrant.

FBI agents could have entered Allied Wallet and simply asked for Mr. Khawaja when serving the search warrant.  They did not.  Instead, on or about August 24, 2018, they concealed themselves in a parking lot and jumped out when Mr. Khawaja "exited the building [and] saw the agents."  (Opp. at 3).  The agents failed to identify themselves as law enforcement.  (*Id.*)  Mr. Khawaja " began to run down a major thoroughfare in Los Angeles," as he feared for his life. (*Id.*)  One of the agents then called Mr. Khawaja on his cell phone and identified himself and his purpose.  Mr. Khawaja answered, explained to the agent why he ran away, and then immediately arranged for the agents to contact his attorney.

Not "a week later," but that very *same day*, Mr. Khawaja met with the FBI agents at the office of his criminal attorney, Robert Shapiro.  At that time, Mr. Khawaja surrendered to the agents the exact phone identified in the search warrant (the "Vertu Phone").  However, upon later examining the phone's data, the FBI agents realized that they asked the issuing court for a warrant for the wrong phone.

 "[A] week later," on or about August 30, 2018, Mr. Khawaja's counsel, Robert Shapiro, with Mr. Khawaja's assent, voluntarily provided his second phone to the FBI and signed a consent for seizure and search of the phone.  (Supp. Julian Aff., ¶ 12, Ex. I, 8/30/2018 Consent to Search.)  An email exchange between Mr. Shapiro and then-prosecutor James Mann discusses the FBI picking up the requested phone from Mr, Shapiro's office on August 30, 2018, and

continues through October 5, 2018.  (Supp. Julian Aff., ¶ 13, Ex. K, 10/5/2018 Email chain between Mann and Shapiro.)

Because that phone was new—that is, "purchased in August 201[8]"—it did not have the volume of past messages the agents expected.  (Opp. at 3).  On September 5, 2018, the FBI returned the Vertu Phone to Mr. Shapiro. (Supp. Julian Aff., ¶ 14, Ex. J, 9/5/2018 Receipt for Property.)

The government also states that a later (unidentified) time, "[a]gents … found evidence that the defendant conducted an online search for 'can you *recover* deleted text messages on iphone [sic]' and '*How to Recover* Deleted Text Messages.'" (Opp. at 3-4) (emphasis added).  But, the government offers no evidence to show that Mr. Khawaja deleted any messages (he did not), or whether some apps did not download past messages to the new iPhone, or whether Mr. Khawaja searched the referenced terms attempting to *recover* past, deleted messages relevant to the investigation.

### b.  Unused (and now presumably useless) Mexican passport.

The government claims that "[e]vidence further shows that the defendant allegedly attempted to secure a fraudulent passport for himself while he remained abroad."  (Opp. at 5).  The government states that in August 2020, agents with Customs and Border Protection ("CBP") intercepted a Mexican passport that contained the defendant's last name and photograph, and was shipped from Mexico City, Mexico to Barranquilla, Colombia.  (Opp. at 5).  CBP apparently did not seize the passport, but let it continue to its destination in Barranquilla, Colombia—no doubt after flagging it as invalid or with instructions to question or arrest any user.

16

As the government notes from August 2020 "[t]o date, the … passport does not appear to have been used." (Opp. at 5). Obviously, if Mr. Khawaja wished to abscond using such a passport, he would have done so already from Lithuania into neighboring Kaliningrad, Russia or Belarus (no extradition treaty) or to Poland or Latvia. He has not. Indeed, because the government knows of it, this passport presumably has been rendered useless for travel and/or will trigger an arrest via CPB or Interpol.

**B. The Court Should Not Apply the FDD to the Present Motion.**

This Motion is narrowly brought solely to access and preserve exculpatory testimony for trial as to a witness who will soon be lost to the Court's jurisdictional reach, and who has compelling reasons never to return to the United States or trust the government.[8] Mr. Khawaja is attempting to vindicate his constitutional rights to a fair trial, to confront the witnesses against him, and have access to available exculpatory evidence.[9] Courts have used their discretion not to apply the FDD in cases to avoid an injustice, and this Court should so here. The government will not be *unfairly* prejudiced by preserving Mr. Nader's testimony for trial.

In *United States v. Hayes*, 99 F. Supp. 3d 409, 416 (S.D.N.Y. 2015), aff'd on other grounds, 118 F. Supp. 3d 620 (S.D.N.Y. 2015), where the defendant residing abroad moved to dismiss his indictment, the court did not apply the FDD because there was no concern of "mutuality." "A primary ground for applying the fugitive disentitlement doctrine is the absence of 'mutuality,' which occurs when *a decision in favor of an applicant would benefit him, but a decision against him would not be enforceable or would not operate to his disadvantage*." *Id.* at

---

[8] The Motion is not, as the government suggests, an opening salvo in an effort to litigate issues long-distance. Mr. Khawaja is well-aware that is something the Court will not allow.

[9] The government's strong effort to deny him this evidence risks a constitutional violation. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 869 (1982) ("other interests protected by the Sixth Amendment look to the degree of prejudice incurred by a defendant as a result of governmental action or inaction").

416 (emphasis added).  Though the court denied defendant's motion, the court did not apply the FDD and heard the motion on the merits because "[a] decision denying relief would *simply leave matters where they were before*." *Id.* (emphasis added).  There is no mutuality concern here either.  If the Court grants this Motion, Mr. Khawaja (and the cause of justice) will benefit from the preservation of vital, exculpatory testimony.  If the Court denies this Motion, it would "simply leave matters where they were before" and ultimately "operate to [Mr. Khawaja's] disadvantage," given the near certainty that Mr. Nader will absent himself from the United States when he is released from prison.

In *United States v. Cornelson*, 595 F. Supp. 3d 265 (S.D.N.Y. 2022), the court similarly refused to apply the FDD based, in part, on lack of mutuality concerns.  There, where the defendant was primarily a citizen of, and resided in, Brazil, the court noted that "[t]he paradigmatic case in which mutuality is absent is where the defendant flees to '*seize an unfair advantage*' or to '*game the system*.'" *Id.* at 272 (emphasis added).  As noted above, there is no such concern here.  Mr. Khawaja cannot be said to be seeking an "unfair advantage" or "gaming the system" by attempting to preserve testimony from a witness who unquestionably has exculpatory evidence and is a source of the half of the allegations in the Indictment.  Even though *Cornelson* and *Hayes* both involve motions to dismiss, which is a far cry from the relief Mr. Khawaja is requesting here, the policies they espouse, especially as it pertains to mutuality, do bear on this case.

On the other hand, the government's cited authority in the Opposition demonstrates what an outlier Mr. Khawaja's circumstances are compared to the types of cases in which the FDD has been applied.  For example, both *Molinaro v. New Jersey*, 396 U.S. 365 (1970) and *Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993)—the seminar Supreme Court cases on the

FDD—involved defendants fleeing *post-conviction*. *Degen v. United States*, 517 U.S. 820 (1996) and *Daccarett-Ghia v. C.I.R.*, 70 F.3d 621 (D.C. Cir. 1995) involved *non-criminal* matters, *and* both cases ruled that the FDD should not apply under the circumstances presented. *United States v. Kashamu*, 656 F. Supp. 863 (N.D. Ill. 2009), *United States v. Oliveri*, 190 F. Supp. 2d 933 (S.D. Tex. 2001), and *United States v. Stanzione*, 391 F. Supp. 1201 (S.D.N.Y. 1975) all involve pretrial *motions to dismiss*. The courts in *Kashamu*, *Oliveri*, and *Stanzione* applied the FDD to deny those motions because the defendants in those case were choosing to selectively participate in the proceeding in an attempt to *put an end to the proceeding*.

Mr. Khawaja's circumstances could not be any more distinguishable. As discussed above, Mr. Khawaja did not "flee" from the United States in June 2019—he left for business reasons. And he left for business reasons *before* he was indicted. By this Motion, Mr. Khawaja is not seeking to terminate this proceeding or gain some upper hand against the government. To the contrary, Mr. Khawaja wants to be fairly prepared to face these charges upon his return, and to do so, the vitally important testimony of Mr. Nader must be preserved (or Mr. Nader detained, or his ability to leave the United States restrained under § 3142 until trial).

Contrary to the government's assertion, the purposes of the FDD would not be served by application here. "[T]he sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked. The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." *Cornelson*, 595 F. Supp. 3d at 272 (quoting *Degen v. United States*, 517 U.S. 820, 828 (1996)). Mr. Khawaja here seeks to preserve crucial, exculpatory testimony from a key witness. He does not seek to dismiss the indictment, fight the charges from abroad, or obtain any undue advantages. The Court should consider this Motion on

the merits and grant Mr. Khawaja the requested relief.  Refusal to do so under the unique

circumstances presented here would "disserve the dignitary purpose for which [the FDD] is

invoked." *Id.*

### IV.    CONCLUSION

This Court should grant this Motion and issue an order finding that Mr. Nader is a

material witness under Section 3144 and directing: (1) that his deposition be taken under Rule 15

and/or (2) that he be treated in accordance with Section 3142 pending Mr. Khawaja's trial. Mr.

Khawaja further requests an order directing the government to produce any Nader-related

discovery under Rule 16, *Brady*, and *Giglio* in advance of Mr. Nader's deposition.


 Dated:  June 19, 2024                                    Respectfully submitted,

                                                         _____
                                                         Kenneth B. Julian
                                                         DC Bar #CA00113
                                                         David Boyadzhyan
                                                         DC Bar #CA00115
                                                         MANATT, PHELPS & PHILLIPS
                                                         695 Town Center Drive
                                                         14th Floor
                                                         Costa Mesa, CA 92626
                                                         Tel: (714) 338-2745
                                                         Email: kjulian@manatt.com
                                                                 dboyadzhyan@manatt.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim No.: 1:19-cr-00374 (RDM) |
| AHMAD "ANDY" KHAWAJA, et al., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record.

Dated:  June 19, 2024

Respectfully submitted,

/s/ Kenneth B. Julian
Kenneth B. Julian
DC Bar #CA00113
MANATT, PHELPS & PHILLIPS
695 Town Center Drive, 14th Floor
Costa Mesa, CA 92626
Tel: (714) 338-2745
Email: kjulian@manatt.com

403061777.3

21